1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Sassoon Family
349 SW Coconut Key Way,
Port Saint Lucie,
FL 34986
Pro Se

FILED by _____ D.C.

AUG 17 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### U.S. DISTRICT COURT

### SOUTHERN DISTRICT OF FLORIDA

MR DAVID EDOUARD SASSOON; THE
SASSOON FAMILY; THE CATTAUI
FAMILY.

                    Plaintiffs,

          v.

ISLAMIC REPUBLIC OF IRAN;
THE IMAD FAYEZ MUGHNIYEH
FAMILY INCLUDING: (WIVES OF
IMAD FAYEZ MUGHIYNEH: SAADA
BADR AL DIN AND WAAFA
MUGHNIYEH); ALI FALLAHIAN;
MOHSEN RABBANI; AHMED REZA
ASGHARI (AKA HAMID REZA ESHAGI
AND MOSHEN RANDJBARAN);
AHMAD VAHIDI; MOSHEN RAZAEE
MIRGHA'ED; HEZBOLLAH
(INCLUDING THE AMAL MOVEMENT,
LOYALTY TO THE RESITANCE BLOC,
AND JIHAD COUNCIL); HASSAN
NASRALLAH; THE QUDS FORCE;
ISLAMIC REVOLUTIONARY GUARD
CORPS (IRGC) OF THE ISLAMIC
REPUBLIC OF IRAN; ISLAMIC JIHAD
ORGENIZATION,

                    Defendants.

Case No.: 17-14294-CIV-MARTINEZ/MAYNARD

**COMPLAINT FOR EQUITABLE
DAMAGES, PUNITIVE
DAMAGES, AND REQUEST FOR
INJUNCTIVE RELIEF
PURSUANT TO:
THE INTERNATIONAL
EMERGENCY ECONOMIC
POWERS ACT (IEEPA); THE
TERRORISM RISK INSURANCE
ACT 2002 (TRIA); THE
LIABILITY UNDER THE ANTI
TERRORISM EXCEPTION TO
THE SOVEREIGN IMMUNITY
ACT 2008; THE FOREIGN
OPERATION EXPORT
FINANCING; AND THE
RELATED PROGRAMS
APPROPRIATIONS ACT OF
1997 (101 (c)).
JURY TRIAL DEMANDED**

Judge:   JOSE E. MARTINEZ

Date Action filed:  August 16, 2017
Date set for trial:

### I. NATURE OF THE CASE

1. Plaintiffs Mr. David Edouard Sassoon; the Sassoon Family; and the Cattaui Family

bring this action jointly, and separately on behalf of the estate of their deceased mother and

cat / div  440  FORT PIERCE
Case #  2:17CV14294
Judge MARTINEZ  Mag MAYNARD
Motn Ifp  none  Fee pd $  none
Receipt #  N/A

- 1 -

daughter, Josephine Celine Esther Moise Cattaui. These plaintiffs, David Sassoon, the Sassoon and Cattaui Families (collectively, jointly and separately referred to as "Plaintiffs") bring this action against Defendants jointly and separately: The Government of The Islamic Republic of Iran; The Imad Fayez Mughniyeh Family, including the wives of Imad Fayez Mughiyneh: Saada Badr Al Din, and Waafa Mughniyeh; Ali Fallahian; Mohsen Rabbani; Ahmed Reza Asghari (AKA Hamid Reza Eshagi And Moshen Randjbaran); Ahmad Vahidi; Mohsen Razaee Mirghha'ed; HEZBOLLAH (Including the AMAL Movement, Loyalty to the Resistance Bloc, and the Jihad Council); Hassan Nasrallah; THE Quds Force; Islamic Revolutionary Guard Corps (IRGC) of the Islamic Republic of Iran, and the Islamic Jihad Organization, herein referred to jointly and separately as Defendants.

This complaint seeks equitable damages, punitive damages and injunctive relief for the use of lethal force, violence, and terrorism on July 18, 1994 against the Jewish community of Argentina that resulted in the death of Josephine Cattaui. The defendants perpetrated an act of terrorism to cause bodily harm, death (loss of life), and damage to property by detonating a van bomb, which the defendants caused to explode at the Asociación Mutual Israelita Argentina (AMIA; Argentine Israelite Mutual Association) building resulting in the death of a U.S. national among the victims. Finally, this complaint seeks treble and punitive damages for fraud and conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), **18 U.S.C. (sec) 1962** for Defendants' collective organized concealment and conspiracy of lethal substances used in the making of explosive device, resulting in the death of 85 innocent civilians in addition to Ms. Josephine Celine Esther Moise Cattaui, a U.S. citizen, of New York, NY, who also resided 70% of her presence in the U.S, in Boca Raton, Florida.

## II. JURISDICTION and PARTIES

2. The Defendants, include: the government of The Islamic Republic of Iran; The Imad Fayez Mughniyeh Family, including the wives of Imad Fayez Mughiyneh: Saada Badr Al Din, and Waafa Mughniyeh; Ali Fallahian; Mohsen Rabbani; Ahmed Reza Asghari (AKA Hamid Reza Eshagi And Moshen Randjbaran); Ahmad Vahidi; Mohsen Razaee Mirghha'ed; HEZBOLLAH Including (the AMAL Movement, Loyalty to the Resistance Bloc, and the Jihad Council); Hassan Nasrallah; THE Quds Force; Islamic Revolutionary Guard Corps (IRGC) of the Islamic Republic of Iran, and Islamic Jihad Organization. Most of whom are representatives

of a sovereign nation. In addition, defendants are officials, representatives, agents, officers, and proxy of said state. All defendants named herein, are listed as sponsors of or are themselves terrorist organizations by the United States  government, the UN, and the European Union and receive direct support including but not limited to: material support, financial support, training, equipment (including weaponry), logistical support, sanctuary and harboring and in many cases direct orders from the government, including the individuals named herein to carry out terrorist attacks and other forms of violence on behalf of the government of the Islamic Republic of Iran (hereafter referred to as Iran).

Plaintiffs, Mr. David Edouard Sassoon, was born in Isle La Motte, Vermont (thus a U.S. citizen), the Sassoon and Cattaui families, maintain residence in Boca Raton, Florida and Mr. Sassoon is a resident of Port Saint Lucie Florida. Josephine Cattaui, on whose behalf the Plaintiffs are suing, was a U.S. citizen and maintained residence in Boca Raton, Florida at the time of her death. All events giving rise to this incident took place in Buenos Aires, Argentina involving a U.S. national and U.S. government contractor. Therefore, jurisdiction of this court is proper.

This court has jurisdiction under **28 U.S.C. § 1331**. Federal question jurisdiction arises pursuant to **42 U.S.C. § 1983**.

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this Act in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

The Court shall hear a claim under this section if–

(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to sub-clause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

(II) in the case of an action that is refiled under this section by reason of section **1083(c)(2)(A)** of the **National Defense Authorization Act for Fiscal Year 2008** or is filed under this section by

reason of section **1083(c)(3)** of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section **1605(a)(7)** (as in effect before the enactment of this section) or section **589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997** (as contained in section *101(c) of division A of Public Law 104–208*) was filed;

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred—

    (I)    a national of the United States;

    (II)    a member of the armed forces; or

otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

    (III)    in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

the act described in paragraph (1) is related to Case Number **1:00CV03110** *(EGS) in the United States District Court for the District of Columbia.*

Subject matter jurisdiction is conferred upon this Court by the **Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(b) and 1605(a)(7).** Defendants have been properly served with process pursuant to **28 U.S.C. § 1608(a)(4).**

## III. FACTUAL ALLEGATIONS

3. David Sassoon is a U.S. citizen and the only son of Josephine Celine Esther Moise Cattaui an Egyptian born Jewess who was an American citizen. She was married to Greek born Dr. Edouard Elias Sassoon, whose parents were Jewish natives of Syria and Egypt. Dr. Sassoon's parents were first expelled from Egypt where his father was a textile merchant and owner of a trading & counting houses in Alexandria and Cairo, and their citizenship was revoked in 1967 in retaliation to Israel's victory in the June 5, 1967 war over her Arab enemies. Dr. Edouard Sassoon's parents were forced to leave without their possessions, while Dr. Sassoon a medical student at the time was detained in Tora Prison in Egypt where he was subjugated to daily beating, sleep deprivation and suffered torture and malnutrition. Finally, after payment of

extortion and ransom money by the family, Dr. Sassoon was released in February 1968 and ordered to leave the country within 24 hours. Dr. Sassoon immigrated to the United States with his family in 1972 from France and became a naturalized citizen in 1980 (thus a U.S. citizen). Dr. Sassoon was an epidemiologist and medical researcher (he was murdered in 1985).

4. Ms. Cattaui immigrated to the United States in 1968 as an asylum seeker after her family along with most of the Jewish community of Egypt was expelled and forced to leave by the Naser regime, as antisemitism reached new heights after the Arab Israeli war between Israel and her neighbors in 1967. Ms. Cattaui became a naturalized citizen in 1978 (and thus a U.S. citizen). Ms. Cattaui reverted back to her maiden name after the murder of her husband Dr. Sassoon in 1985.

5. Ms. Cattaui was highly intelligent and educated with an under-graduate degree in archeology and anthropology from the University of Athens, and a graduate degree in Political Science from the Graduate Institute of International Studies. Furthermore, Ms. Cattaui was a linguist (fluent in 8 languages), Middle East expert and intelligence analyst, she was initially employed by the National Security Research Inc a U.S. government defense contractor (*acquired since by CACI in 2005*), where she was an intelligence analyst between 1985 and 1993 with the company at its offices at Alexandria, VA. In 1993 Ms. Cattaui joined MZM Inc, a U.S. government defense and intelligence contractor *(acquired since by Veritas Capital in 2005 and became Athena Innovative Solutions Inc, which was later acquired by CACI in 2007)* as a senior intelligence analyst and Middle East specialist with a primary focus on counter terrorism related assignments. Ms. Cattaui worked at MZM's offices in Washington DC, and Tampa, Florida where most of her work was related to providing intelligence analysis, and linguistic capabilities including interpretation, analysis and translation of foreign documents for the Foreign Terrorist Tracking Task Force. Ms. Cattaui was a devoted mother, a patriot who was grateful to the United States for opening its doors to her and her family after they were abused, their properties confiscated by the anti-Semitic Naser regime in Egypt and eventually forced to leave. Ms. Cattaui raised her son on the principles of patriotism, strong moral upbringing, integrity, love and respect for others, and a appreciation for the freedom and liberty afforded by the Constitution of the United States. Ms. Cattaui died while performing her duties and serving her country, thus she is considered a loyal citizen and patriot of this great nation.

6. On July 15, 1994 Ms. Cattaui arrived in Buenos Aires, Argentina for a work assignment, while it is not clear the exact purpose of the trip, MZM officials informed Ms. Cattaui's father, Mr. Moise Cattaui and her father in law Mr. Elias Sassoon (both now have passed since) that the nature of her trip was classified.

7. The family's investigators attempted to build a chronological timeline of her travel to Argentina, and within Buenos Aires between July 15, 1994 and July 18, 1994. The reconstruction of her travels within the city of Buenos Aires are based on physical evidence, interviews of former colleagues, hotel staff in Buenos Aires, and her family. Evidence suggest, that Ms. Cattaui was scheduled for several meetings on the ground in Argentina including a meeting she had at the U.S. Embassy on July 17, 1994. On July 18, 1994, she was reportedly supposed to attend a meeting with two individuals; Mr. Andrés Gustavo Malamud, and Mr. León Gregorio Knorpel at the Asociación Mutual Israelita Argentina (AMIA; Argentine Israelite Mutual Association) building at 10:00 am.

8. Ms. Cattaui arrived in a taxi from her hotel approximately around 09:45 am, at approximately 09:50 a suicide bomber drove a Renault Trafic van bomb loaded with approximately 600 lb of ammonium nitrate fertilizer and fuel oil explosive mixture, into the Jewish Community Center building located in the densely constructed commercial area of Buenos Aires.

9. It is believed that Ms. Cattaui who had disembarked from her taxi across the street had not made it inside the building when the van drove into the building as she was approaching the entrance. However, according to eye witnesses, extensive media coverage and examination of the evidence including forensic investigations by the Argentinian authorities, Israeli police investigators who included four forensic scientists who assisted with the building of ante mortem files and victim identification. The explosive is thought to have been arranged to focus the blast on the building approximately 9.8 to 16.4 ft., away, exhibiting a shaped charge or explosively formed penetrator effect. The exterior walls of this five-story building were of brick masonry construction, which supported the floor slabs. The air blast from the bomb destroyed the exposed load-bearing walls which, in turn, led to progressive failure of the floor slabs and virtually total collapse of the building.

10. Ms. Cattaui suffered multiple injuries including blast related ocular trauma, which is a group of penetrating and blunt force injuries to the eye and its structure caused by the detonation

of explosive materials. As well as, blast-induced traumatic brain injury (bTBI), collapse of gas-filled organs, nerve fiber and vascular shearing occurred in her frontal and temporal lobes, damage to her optic nerve in her right eye, vitreous hemorrhage, traumatic macular holes, retinal detachment, and optic nerve injury in her left eye. Fractured skull, four broken ribs, loss of her right leg below the knee, sever damage to her spine including left broken arm, and fractured wrist. Severe internal bleeding, upon full globe exploration with 360-degree removal of the conjunctiva (periotomy), separation of the rectus muscles, and subsequent examination of the sclera it was determined that the injuries sustained by Ms. Cattaui were so severe that her globe had been injured and was irreparable.

11. Foreign debris were removed from her body, she also suffered from Canalicular injuries, as well as lid lacerations. Despite medical teams' best efforts and continuous attempts to save her life including two surgeries in less than 24 hours, Ms. Cattaui was pronounced dead on July 19, 1994 at approximately 12:00 pm due to blast lungs and internal bleeding. Her injuries were too severe and she lost a lot of blood. After her last surgery in attempt to repair her lungs, she went into cardiac arrest.

12. Over the years, the case has been marked by incompetence and accusations of cover-ups. All suspects in the "local connection" (among them, many members of the Buenos Aires Provincial Police) were found to be "not guilty" in September 2004. In August 2005, federal judge Juan José Galeano, in charge of the case, was impeached and removed from his post on a charge of "serious" irregularities due to mishandling of the investigation. In 2005, Cardinal Jorge Mario Bergoglio, who would later become Pope Francis, was the first public personality to sign a petition for justice in the AMIA bombing case. He was one of the signatories on a document called "85 victims, 85 signatures" as part of the bombing's 11th anniversary.

13. Due to the nature of Ms. Cattaui's sensitive and classified work at the time, and due to the ongoing investigation both the Cattaui and Sassoon families and her son David have allowed the authorities the time to identify the perpetrators and bring them to justice.

14. The families received a glimmer of hope on October 25, 2006, when then Argentine prosecutors Alberto Nisman and Marcelo Martínez Burgos formally accused the government of Iran of directing the bombing, and the Hezbollah militia of carrying it out. According to the prosecution's claims in 2006, Argentina had been targeted by Iran after Buenos Aires' decision to

suspend a nuclear technology transfer contract to Tehran. However, their hopes were yet again dashed with the untimely murder of Mr. Nisman in 2015.

15. As of the filing of the claim, no suspects have been convicted for the bombing and there have been many allegations made, including those blaming the government of Iran. The investigations were marred by incompetence; former President Néstor Kirchner called them a "national disgrace" in 2005. In 1999 an arrest warrant was issued against Hezbollah member Imad Mugniyah, in connection with the attack. Petitioners reiterate, Argentine justice accused Tehran in 2006 of being behind the attacks, allegedly because of Buenos Aires' decision to suspend a nuclear material delivery and technology transfer.

16. Israeli diplomatic sources who read the "final" report by Secretaría de Inteligencia (SIDE) (Argentinian Intelligence Service) on the attack alleged in 2003 that the attack was a suicide bombing carried out by Ibrahim Hussein Berro, a 21-year-old Hezbollah operative who has been honored with a plaque in southern Lebanon for his "martyrdom" on July 18, 1994, the date of the bombing. This investigation was carried out jointly with the U.S. Federal Bureau of Investigation. Hussein had been identified by the FBI and Argentine intelligence, and corroborated by at least three witnesses. According to official Argentine government prosecutor, Alberto Nisman, Hussein's two US-based brothers had testified that he had joined the radical Shia militant group Hezbollah. "The brothers' testimony was substantial, rich in detail and showed that he was the one who was killed," Mr. Nisman added.

17. According to reports by Algemeiner, on July 5th, 2017, that DNA not assignable to any of the victims has been identified. This new evidence will allow investigators to test the prevailing suspicion that the bombing was committed by Ibrahim Hussein Berro, a member of Hezbollah.

18. Argentines prosecutors formally charged the Iranian authorities of directing Hezbollah to carry out the attack. The Justice called for the arrest of top Iranian authorities. The Iranian defense minister, Ahmad Vahidi was accused of masterminding the attack.

19. Argentine's government required the extradition of those accused of the attack but Iran has always refused to accept the verdict of the Argentine's Justice.

20. In November 2007, Interpol on behalf of the Argentine government, published the names of six individuals officially accused for their role in the terrorist attack. They were entered in the Interpol red notice list, which included:

Imad Mughniyah

Ali Fallahian

Mohsen Rabbani

Ahmad Reza Asghari

Ahmad Vahidi

Mohsen Rezaee

21. In August 2009, BBC News reported that Ahmad Vahidi had become Iran's defense minister-designate under the 2009 Mahmoud Ahmadinejad administration, and is on Interpol's wanted list over the AMIA bombing. Vahidi led a unit of Iran's Revolutionary Guard called Quds Force at the time of the attack, and has been accused of planning the bombings. Iran dismissed this development as a "Zionist plot". On June 1, 2011, Bolivia apologized to Argentina for Ahmad Vahidi's unannounced visit to the country, and announced that he would be leaving Bolivia immediately.

22. On May 24, 2013, it was reported that two of the Iranian AMIA bombing suspects accused of having planned the attack, Mohsen Rezai and Ali Akbar Velayati, were candidates for the Iranian presidential elections. In May 2013, Prosecutor Alberto Nisman published a 502-page indictment accusing Iran of establishing terrorist networks throughout Latin America – including in Argentina, Brazil, Paraguay, Uruguay, Chile, Colombia, Guyana, Trinidad and Tobago and Suriname – dating back to the 1980s. Nisman also said new evidence underscored the responsibility of Mohsen Rabbani, the former Iranian cultural attaché in Argentina, as of the masterminds of the AMIA bombing and "coordinator of the Iranian infiltration of South America, especially in Guyana", and said US court documents showed Islamist militant Abdul Kadir – who was sentenced to life in prison in 2010 for participating in a foiled plan to attack John F. Kennedy International Airport in New York – was Rabbani's disciple.

23. On January18, 2015, Mr. Nisman was found dead at his home in Buenos Aires, hours before he was due to explain his allegations at the Argentine parliament. A gun and spent shell casing were found next to the body, and a government official said the death was likely a suicide although others considered the death suspicious.

24. In fact, the Islamist group linked to Iran and possibly Hezbollah claimed responsibility for the July 18, 1994 attack.

25. On 26 February 2016, the Argentine prosecutor Ricardo Sáenz stated Nisman's death "was a homicide indeed", claiming the cause should be directed to the federal justice.

26. As of the time of filing of this Complaint, no one including the named defendants, who have been now named by the Argentinian, Israeli and U.S. authorities as having direct involvement including planning, orchestrating, financing and ordering the attack, which claimed the lives of 85 innocent victims in addition to Ms. Cattaui were indicted, arrested, questioned, or convicted by any court.

27. Ms. Cattaui missed on the opportunity to see her grandson Gabriel and on the opportunity to be with her family who loved her and miss her terribly. Both Ms. Cattaui and her family were maliciously, deliberately and without cause deprived of the life she otherwise would have had enjoying her family and loved ones and getting to see her grandson. Her son, Mr. David Sassoon, lost both his parents, first his father in 1985, at age 12 and then at age 20, almost 3 months shy of his 21st birth day he lost his mother in this unspeakable cowardice attack on July 18, 1994.

28. There have been allegations of cover up and conspiracies surrounding this tragic event. However, one thing is irrefutable. Both the government of Iran and its security and intelligence apparatus are sponsors of terrorism as the evidence have shown since 1979, Iran as a nation administers intimidation, murder, terrorism in all its form, and is a government deprived of any basic appreciation for human lives. In addition, Hezbollah is a terrorist organization and listed as such by the United States government, the UN, and the EU. More importantly, Hezbollah receives its political legitimacy, financial support, training, logistical support and spiritual support as well as sanctuary and other material support from its main benefactor the "Islamic Republic of Iran."

29. The latest events taken place earlier this year in 2017, leaves the family without any avenue for justice and or recourse. Therefore, the family feels compelled and with no other option but to seek judicial interference to secure justice for Ms. Josephine Celine Esther Moise Cattaui and her family.

30. Physical evidence, investigative reports carried out by three separate governments including the United States and Argentinian authorities found irrefutable evidence that Iran and Hezbollah were responsible for the attack and the murder of members of the Jewish community in Argentina, including non-Jews, and in the case of Ms. Cattaui, a U.S. national.

- 10 -

31. The family does not wish to politicize these proceedings, but unfortunately this is a unique case, which coincides with recent events including Iran's current controversial nuclear program, which as stated above, is at the heart of this Complaint, as some reports state was the reason behind the attack on the AMIA building, which claimed the lives of so many people and injured a score of more than a hundred-innocent people.

32. Furthermore, the Iranian government who seeks to benefit from the recent agreement signed with the United States, the EU, UN, and the UK in relation to its nuclear program where the government is expected to use assets held by the United States in exchange for cooperation on its nuclear program within the provisions of the signed agreement with the previous administration. However, it is with reason that the Cattaui and Sassoon families along with other families around the United States fear that Iran would use this money to not only further its nuclear armament ambition, but also continue to fund the destabilization of neighboring countries and supporting terror organizations such as Al Quds, Hezbollah, Islamic Jihad, and HAMAS among others.

## IV. CAUSES OF ACTION
### FIRST CAUSE OF ACTION
#### Wrongful Death

33. On July 18,1994, decedent Josephine Cattaui (hereinafter "Decedent") arrived in Buenos Aires Argentina on a work-related assignment, as part of her work for MZM Inc., a U.S. defense contractor, which was at the time contracted by both the U.S Department of Defense and the Intelligence Community.  Ms. Cattaui, told her family that she was intending to make use of her trip by visiting the local Jewish community to gather research for her book she intended to author about the Jewish community in Latin America, had it not been for her untimely death. As stated above, no one of Ms. Catttaui's family knew of the nature of her work at MZM and or her assignment in Argentina if any, nor the exact purpose of the trip.

34. Fallahian was on the official wanted list of Interpol in connection with the bombing of the Asociación Mutual Israelita Argentina (AMIA). The Interpol issued a red notice for him and other suspects for their alleged roles in the attack in March 2007. The arrest warrant is based on the allegation that senior Iranian officials planned the attack in an August 1993 meeting, including Khamenei, the Supreme Leader, Mohammad Hejazi, the then Khamanei's intelligence

and security advisor, Rafsanjani, then president, Fallahian, then intelligence minister, and Ali Akbar Velayati, then foreign minister.

35. Mughniyeh was formally charged by Argentina for his alleged involvement in 17 March 1992 bombings of the Israeli embassy in Buenos Aires, which killed 29 and the AMIA cultural building in July 1994, killing 85 people. In March 2007, the Interpol issued "red notices" for his and others' alleged roles in the attack.

36. Asghari was the third secretary of the Iranian embassy in Buenos Aires "until his abrupt departure from Argentina" on July 1, 1994. In November 2006, Argentine Judge Rodolfo Canicoba Corral issued international arrest warrants for Asghari and eight other men — six other Iranians and one Lebanese — in connection to the July 18, 1994, suicide bombing. The AMIA bombing resulted in the murder of 85 people in addition to Ms. Cattaui and serious injuries to 151. According to an Argentine government investigative report on the bombing "Mr. Asghari was one of the highest placed persons in charge of the attack, and was also responsible for activating the clandestine networks of Iranians in Argentina".

37. The report stated that Asghari was present at an August 14, 1993, meeting with former Iranian President Akbar Hashemi Rafsanjani and his top deputies in the Iranian city of Mashad where the decision was made to commit the terrorist attack. Prior to his posting in Argentina, Asghari "had served in Iran's renowned Revolutionary Guard", according to the Argentine investigative report. Asghari's "name surfaced as a delegate to a 2002 U.N. conference in Geneva, where he was listed as the Iranian foreign ministry's first secretary in the department for international economic affairs", according to Brett Stephens, an editorial columnist at The Wall Street Journal.

38. The defendants knowingly and deliberately conspired and planned to carry out a terrorist attack in Buenos Aires, Argentina due to politically motivated reasons, thereby committing atrocities and political violence to intimidate and further its own agenda through force and violence.

## SECOND CAUSE OF ACTION

### Strict Tort Liability

39. The defendant plotted and funded this violent attack according to Argentinian prosecution's claims in 2006: "*Argentina had been targeted by Iran after Buenos Aires' decision to suspend a nuclear technology transfer contract to Tehran.*"

40. Defendants knew of ramification of such an attack using such methods, and more importantly defendants knew the potential loss of lives, the spread hazardous material as a result of flying fragments, shrapnel and debris to public health as well as damage to property.

41. As a result of the violent attack, Decedent died within 24 hours of sustaining her injuries.

## THIRD CAUSE OF ACTION

### State Sponsored Terrorism

42. Vahidi was wanted by Interpol for his alleged participation in the bombing, Vahidi was serving as the commander of a special unit of Iran's Revolutionary Guard known as the Quds Force when the attack occurred. He is one of five Iranians sought in the bombing.

43. In June 2010, Vahidi was blacklisted by the U.S Government,

44. Mohsen Rezaee Mirgha'ed's is an Iranian politician formerly affiliated with Resistance Front of Islamic Iran and senior military officer in the Army of the Guardians of the Islamic Revolution who currently holds office as the secretary of the Expediency Discernment Council. In 1998, Mohsen Rezaee's son, Ahmad, defected to the United States, where he told officials that the attack on the Israeli embassy in Buenos Aires was planned in Tehran. The son told U.S. authorities that he had accompanied his father to Lebanon to witness the training. Mohsen Rezaei had been on the official Wanted list of Interpol in March 2007, for allegations of "Aggravated Murder and Damages" related to the 1994 AMIA bombing case Rezaei rejected the allegations.

45. As a direct and proximate cause of Defendant's acts, Ms. Cattaui was tragically and senselessly severely injured on July 18, 1994 and died of her wounds on July 19, 1994.

46. Both Islamic Jihad and Hezbollah admitted responsibility and took credit for the attack.

47. Imad Fayez Mughniyeh was a senior member of Lebanon's Islamic Jihad Organization and Hezbollah. Information about Mughniyeh is limited, but he is generally understood to have been a principal leader and operative for a number of years within Hezbollah's military, intelligence, and security apparatuses. He may also have been among the founders of Hezbollah in the 1980s. He has been described as "a sort of 'super chief of staff'" within Hezbollah. According to former CIA agent Robert Baer, "*Mughniyah is probably the most intelligent, most capable operative we've ever run across, including the KGB or anybody else. He enters by one door, exits by another, changes his cars daily, never makes appointments on a telephone, never is predictable. He only uses people that are related to him that he can trust. He doesn't just recruit people.*"

48. In the mid-February 1997, the pro-Israeli South Lebanese Army radio station reported that Iran's intelligence service had dispatched Mughniyeh to Lebanon to directly supervise the reorganization of Hezbollah's security apparatus concerned with Palestinian affairs in Lebanon and to work as a security liaison between Hezbollah and Iranian intelligence. Mughniyeh also reportedly controlled Hezbollah's security apparatus, the Special Operations Command, which handles intelligence and conducts overseas terrorist acts. Allegedly, although he used Hezbollah as a cover, he reported to the Iranians. According to Jeffery Goldberg, writing in the New Yorker, "It is believed that Mugniyeh takes orders from the office of Iran's supreme leader, Ayatollah Khamenei, but that he reports to a man named Qasem Soleimani, the chief of a branch of the Iranian Revolutionary Guard Corps called Al Quds, or the Jerusalem Force—the arm of the Iranian government responsible for sponsoring terror attacks on Israeli targets." In January 2002, a declassified US cable also stated that Mughnieah left Hezbollah and got closer to Iran. However, Mughniyeh was a member of Hezbollah's jihadist council until his death in February 2008. After the July 2006 war between Israel and Hezbollah, he was assigned by Hezbollah the improvement of the military capabilities of the resistance in Lebanon and Damascus, which became the center for this activity. The European Union listed him as "Senior Intelligence Officer of Hezbollah."

49. After his death in 2008, Mughniyeh's body was taken to Beirut and a funeral was organized by Hezbollah on February14, 2008. Senior Iranian officials attended the service: (*Ali Akbar Velayati representing the supreme leader, Ayatollah Ali Khamenei, and Foreign Minister*

1    *Manuchehr Mottaki representing President Mahmoud Ahmadinejad).* A symbolic tomb was
2    erected for Mughniyeh in the Behesht-e-Zahra cemetery of Tehran.

3        50. Ibrahim Hussein Berro, was a member of Hezbollah allegedly responsible for the
4    1994 AMIA Bombing. Berro, a 21-year-old citizen of Lebanon, is accused by Argentine, U.S.
5    and Israeli officials of blowing up the headquarters of Argentina's Jewish community. He then
6    traveled to Iran, where he presumably received training.

7                                    **FOURTH CAUSE OF ACTION**
8                                         <u>**Failure to Warn**</u>
9
10       51. In 1983, Mughniyeh married his cousin, Saada Badr Al Din, the sister of Mustafa
11   Badr Al Din. Mughniyeh had three children according to his mother: Fatima (born August 1984),
12   Mustafa (born January 1987), and Jihad (estimated to have been age 25 at death). In September
13   1991, Mugniyeh's wife and children were sent to Tehran for security reasons. Later his family
14   began to live in south Lebanon. Mughniyah also married an Iranian woman, Wafaa Mughniyeh,
     with whom he lived in Damascus.

15       52. Imad's younger son, Jihad Mughniyah, was killed in the Mazraat Amal incident in the
16   Syrian Golan sector on January 18, 2015. Five other Hezbollah members and an Iranian Quds
17   Force general were also killed in the attack.

18       53. Defendants Waafa and Saada knew, or with the exercise of reasonable care, should
19   have known that their husband was a member of a vicious, criminal and violent organization that
20   carried out terrorist attacks. He was a public figure among the terrorist networks, Iranian officials
21   and in Lebanon among Hezbollah. In addition, his Iranian wife Waafa, in particular was an
22   outspoken woman. After his death, she accused Syrian officials of conspiracy in relation to his
23   death. After returning to Iran from Damascus, she stated "This is why the Syrian regime has
24   refused the help of Iran and Hezbollah in the investigation of the murder... The Syrian traitors
25   assisted in my husband's murder." Despite this knowledge, no information was offered to the
26   Argentinian authorities, U.S. Embassy in Lebanon, the FBI, or the Jewish community in Buenos
     Aires about a potential and eminent attack.

27       54. At all times relevant to this investigation and prior to the attack, Defendants Saada
28   and Waafa had actual and/or constructive knowledge of the dangers mentioned above and the

possibility of a pending terrorist attack. Despite this knowledge, they continued on with their lives with disregard for the general public, potential risk to innocent women and children who were not even Jewish, by refusing to even as much as send a letter, even anonymously and they were both in reckless disregard for the lives of women, children and elderly regardless of their race, sex, ethnicity or religious affiliation, whom the bomb targeted in its devastating explosion and who were therefore injured and many killed including Ms. Cattaui.

55. Defendants breached their duty to warn the public and the authorities about a potential attack, and Saada breached her duty to warn Lebanese and U.S. authorities including the U.S. Embassy personnel who very likely would have protected her and given her sanctuary.

56. Defendant's failure to warn has resulted in the death of 85 people and the severe injuries of 151 people including the death of Ms. Josephine Cattaui. The attack that resulted in the death of Ms. Cattaui went beyond any political agenda, the AMIA bombing was not a military target, this was a criminal act that resulted in the death of a U.S. citizen and government contractor. Hence, the defendants Saada and Waafa had a responsibility at a minimum to notify the authorities even anonymously of the then pending attack. Even if they did not know the particulars of the operation, exact time and date or even the exact target, still a warning to the Argentinian Embassy, or the U.S. Embassy would have at least given authorities the opportunity to investigate or perhaps take precautionary measures to prevent the attack.

57. Defendants cannot claim that they had no knowledge of their husband's membership or involvement with Hezbollah, nor can they claim that they were unaware of Hezbollah's determined anti-Israeli, anti-Western and anti-Semitic policies and ongoing conflict and war with Israel and the United States. Neither can the defendants claim lack of knowledge of Mr. Mughniyah's violent past and ongoing involvement with Iranian intelligence, Hezbollah as well as the planning and execution of multiple terrorist attacks that claimed the lives of innocent civilians including women and children. Hundreds (perhaps even thousands) of news articles, media coverage from around the world including the Middle East were written in several languages including Arabic and Farsi about both their husband and Hezbollah and its atrocities against innocent civilians including in cases against Muslims.

1

2

## FIFTH CAUSE OF ACTION

3

### Conspiracy and Fraud in Violation

4

### of the Racketeer Influenced and Corrupt Organizations Act (RICO),

5

### 18 U.S.C. (sec) 1962, and Request for Treble Damages.

6

7     58. Defendants engaged in a conspiracy to defraud by collectively agreeing to conceal

the involvement of members of the government, terrorist organizations Hezbollah and Islamic

8     Jihad and continued to hinder the efforts of investigators by refusing to share information and

9     make suspects identified by Argentinian and U.S. law enforcement and intelligence investigators

10    available for questioning or cross examination by Argentinian prosecutors.

11    59. In 1979, Defendant (Islamic Republic of Iran) formed an Islamist totalitarian and

12    dictatorship regime based on Sharia' interpretation of Islamic law and the Quran. Forming one of

the world's largest and most powerful sponsor regime of terrorism, political instability and

13    carrier of assassinations in the world.

14    60.  Scholars differ as to when Hezbollah came to be a distinct entity. Various sources

15    list the official formation of the group as early as 1982 whereas others maintain that Hezbollah

16    remained an amalgamation of various violent Shi'a extremists until as late as 1985. Another

17    version states that it was formed by supporters of Sheikh Ragheb Harb, a leader of the southern

18    Shia resistance killed by Israel in 1984. Regardless of when the name came into official use, a

19    number of Shi'a groups were slowly assimilated into the organization, such as Islamic Jihad,

20    Organization of the Oppressed-on Earth and the Revolutionary Justice Organization. These

21    designations are considered to be synonymous with Hezbollah by the US, Israel and Canada.

22    61.  Hezbollah receives military training, weapons, and financial support from Iran, and

political support from Syria.

23    62. Hezbollah's status as a legitimate political party, a terrorist group, a resistance

24    movement, or some combination thereof is a contentious at best. The Arab League, United

25    States, France, the Gulf Cooperation Council, Canada, Japan, the Netherlands, and Israel have

26    classified Hezbollah as a terrorist organization. The European Union, New Zealand, the United

27    Kingdom, and Australia have proscribed Hezbollah's military wing as a terrorist organization,

28    while making a distinction (by splitting hair) with Hezbollah's political wing.

- 17 -

62. All Defendants contributed financially, logistically, and provided material support to fund the training of the suicide bomber, provide travel documents and travel cost as well as material support including specialized training to evade intelligence and law enforcement agencies' attention in Argentina and familiarization training with the city of Buenos Aires and the country of Argentina including the AMIA building. This also included providing financial support to acquire the vehicle used in the attack, the material to assemble the bomb and temporary safe houses or rental accommodation for the attacker and perhaps even a support team including a reconnaissance team to surveil the target prior to the attack.

63. For the past 23 years the Iranian government lobbied the Argentinian government including the allegations made by Abolghasem Mesbahi, aka "Witness C", a former Inranian intelligence officer, in an interview with Argentinian Federal judge Juan José Galeano, where Mesbahi reportedly said a former Argentine president accepted a $10 million payment from Tehran to block the investigation. Former President Carlos Menem claimed in 2004 that the attack had been related to his support to the US during the First Gulf War and to his visit to Israel during his mandate. Abolghasem Mesbahi claimed to the Argentine court that Iran had planned the bombing, thinking the center was a base for the Israeli secret service.

64. In January 2015, Alberto Nisman, the prosecutor in charge of the AMIA bombing, filed a 300-page complaint accusing President Cristina Fernández de Kirchner and Foreign Minister Héctor Timerman among other pro-government political figures of "covering up" Iranian citizens' alleged involvement in the 1994 attack. Nisman said his accusations were based on phone taps on close political allies of Fernández, whom he said conspired in a "sophisticated criminal plan" to negotiate with Rabbani himself, one of the main suspects of perpetrating the deadly bombing. According to the accusation, Rabbani lobbied for Iranian oil to be exchanged for Argentinian grain, while Argentina would cancel an international Interpol arrest warrant against Rabbani and other senior Iranian officials.

65. In March 2015, three former Venezuelan government officials interviewed by Veja (a Brazilian weekly news magazine) stated that former Venezuelan President, Hugo Chávez and Iran's former President Mahmoud Ahmadinejad the two leaders allegedly met in 2007. Ahmadinejad was seeking Chávez's assistance in lobbying the Argentinian government. Iran wanted to discuss payments to the Argentine government of Cristina Kirchner in order for Iran to

receive Argentine nuclear technology and the cessation of work between Argentina and Interpol involving Iranian individuals involved in the AMIA bombing.

66. As a result of this collective action to defraud the public, the victims and their families Plaintiffs have suffered injuries indicated above. Treble damages are therefore appropriate under RICO to punish the conspiratorial nature of Defendants' planned concealment of known criminal and terrorist attack perpetrated, organized and funded by the Iranian government, its officials and agents, and facilitated and carried out by Hezbollah at the behest of the government of the Islamic Republic of Iran, and the involvement of all conspirators including Islamic Jihad. This concealment and continues attempt to cover up from Plaintiffs by Defendants, was the result of careful planning that was also concealed and included defendants and most likely other characters yet to be identified. Defendants actions resulted in the death of Ms. Cattaui as well as 85 innocent civilians and injuring 151 innocent mostly Argentinian nationals.

67. Islamic Jihad and Hezbollah have already claimed responsibility for the attack.

## SIXTH CAUSE OF ACTION
### Anti-Terrorism Act

68. Defendants are officials, agents, and proxy agents of a government representing a nation member of the United Nations with recognizable borders, political system, judicial and executive structure and economic system and a defined recognizable leadership. Some of the defendants are also senior officials in a government military and intelligence unit such as Al Quds an organization listed as a terrorist organization by the United States.

61. While it reports directly to the Supreme Leader of Iran, there are debates over how independently Quds Force operates. Mahan Abedin, director of research at the London-based Center for the Study of Terrorism (and editor of *Islamism Digest*), believes the unit is not independent: "*Quds Force, although it's a highly specialized department, it is subject to strict, iron-clad military discipline. It's completely controlled by the military hierarchy of the IRGC, and the IRGC is very tightly controlled by the highest levels of the administration in Iran.*" According to a Los Angeles Times report, in Abedin's view, "*[I]t's a very capable force—their people are extremely talented, [and] they tend to be the best people in the IRGC.*"

62. The Quds Force trains and equips foreign Islamic revolutionary groups around the Middle East. The paramilitary instruction provided by the Quds Force typically occurs in Iran or Sudan. Foreign recruits are transported from their home countries to Iran to receive training. The Quds Force sometimes plays a more direct role in the military operations of the forces it trains, including pre-attack planning and operation-specific military advice.

63. On October 11, 2011, the Obama Administration revealed the United States Government's allegations that the Quds Force was involved with the plot to assassinate Saudi Arabia's former Ambassador to the United States Adel al-Jubeir, which also entailed plans to bomb the Israeli and Saudi embassies in Washington, D.C.

64. The United States Department of the Treasury designated the Quds Force under Executive Order 13224 for providing material support to US-designated terrorist organizations on October 25, 2007, prohibiting transactions between the group and U.S. citizens, and freezing any assets under U.S. jurisdiction. The Government of Canada designated the Quds Force as a terrorist organization on December 17, 2012.

66. The Quds Force is a special forces unit of Iran's Revolutionary Guards responsible for their extraterritorial operations. The Quds Force reports directly to the Supreme Leader of Iran, Ali Khamenei. Its commander is Major General Qasem Soleimani and his deputy was Hossein Hamadani. While "little is reliably known" about the force, as of 2007, its size was estimated at 15,000 troops. The United States has designated the Quds Force a supporter of terrorism since 2007.

67. Hezbollah's funding, allegedly comes from Lebanese business groups, private persons, businessmen, the Lebanese diaspora involved in African diamond exploration, other Islamic groups and countries, and the taxes paid by the Shia Lebanese. Hezbollah says that the main source of its income comes from its own investment portfolios and donations by Muslims, however, Western law enforcement and intelligence sources maintain that Hezbollah actually receives most of its financial, training, weapons, explosives, political, diplomatic, and organizational aid from both the Iranian and Syrian governments.

68. According to law enforcements, declassified intelligence reports as well as reports by the U.S. State Department, the Iranian government is said to have given Hezbollah $400 million between 1983 and 1989 through donation. The situation has been changed due to economic problems, but Iran still funds humanitarian actions carried on by Hezbollah. According to reports

released by the U.S. State Department in February 2010, Hezbollah received $400 million from Iran.

69. The US government estimates that Iran's government has been giving Hezbollah about US$60–100 million per year in financial assistance. Other estimates are as high as $200-million annually. In 2011 Iran earmarked $7 million to Hezbollah's activities in the region according to media reports, Hezbollah has relied also on funding from the Shi'ite Lebanese Diaspora in West Africa, the United States and, most importantly, the Triple Frontier, or tri-border area, along the junction of Paraguay, Argentina, and Brazil.

70. U.S. law enforcement officials have identified an illegal multimillion-dollar cigarette-smuggling fund-raising operation and a drug smuggling operation.

71. Members of the Venezuelan government have been accused of providing financial aid to Hezbollah by the United States Department of the Treasury. According to the testimony of a former Assistant Secretary of State for Western Hemisphere Affairs, Roger Noriega, Hugo Chávez's government gave "indispensable support" to Iran and Hezbollah in the Western Hemisphere. In an article by the conservative think tank American Enterprise Institute, Noriega explained how two witnesses alleged that Ghazi Atef Nassereddine, a Venezuelan diplomat in Syria, was an operative of Hezbollah who used Venezuelan entities to launder money for Hezbollah with President Nicolas Maduro's personal approval.

72. All Defendants breached their respective duties to the Valhalla community and to Plaintiffs. As a result, Plaintiffs have suffered damages indicated above.

## Legal Argument

73. The Anti-Terrorism Act, declares that any "national of the United States" or his/her survivors may sue for injuries "by reason of an act of international terrorism." 18 U.S. §2333. The law allows plaintiffs to hold accountable organizations in conspiracies that supported the international terrorism and sue them in U.S. federal courts for monetary damages.

74. §2339B. Makes it a crime to knowingly provide material support or resources to designated foreign terrorist organizations.
In enacting this law, Congress found that –

"(1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States; ...

"(6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and

"(7) foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

"(b) Purpose. – The purpose of this subtitle [*subtitle A (Secs.301-303) of title III of Pub. L. 104-132, enacting this section and section 1189 of Title 8, Aliens and Nationality*] is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."

75. Iran's extensive support and direction of terrorism were widely reported in the media since 1979, and Hezbollah at least since 1982. Further, numerous military officials, diplomats, and heads of state disclosed Iran's involvement in killing and injuring U.S. diplomatic missions, U.S. Service Members, Israeli Embassies, both U.S. and Israeli citizens including the kidnapping and murder of U.S. and other Western diplomats, clergy, journalists and intelligence officers including Terry Anderson, Terry Waite, John Matrick McCarthy, and William Francis Buckley.

76. Iran and its co-conspirators violated the Anti-Terrorism Act by providing material support (defined by law to include financial support) to Iran, a "State Sponsor of Terrorism," while knowing that such support would be used for committing acts of international terrorism against American, Israeli and Argentinian civilians.

77. The United States has developed a comprehensive economic sanctions regime to prevent Iran, a state sponsor of terrorism, from sponsoring acts of international terrorism. *The International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1626 (1977) (codified at 50 U.S.C. §§ 1701 et seq.)*, enacted by Congress in 1977, is the central legal authority for the Iran economic sanctions program. Since the 1983 terrorist attacks against the American servicemen in Beirut, Lebanon, the IEEPA has been extensively used to block Iranian assets.

78. Following the September 11, 2001 terrorist attacks, Congress passed the *Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337* (codified at **28 U.S.C. § 1610 note**), which created an exception to the **IEEPA** ban on United States nationals from transferring or dealing in blocked assets of state sponsors of terrorism.

79. The **TRIA** provides that the "blocked assets of [a] terrorist party" shall be available for execution or attachment to satisfy a judgment against a terrorist party on a claim based upon an act of terrorism. **Id. § 201(a)**.

80. Under the **TRIA**, Congress made a policy determination that national security and foreign policy interests would be better served by making blocked assets of a terrorist party available to compensate the victims of international terrorism, rather than have those assets languish in a United States bank account.

81. Permitting blocked assets of a terrorist party to be used to satisfy terrorism judgments against a state sponsor of terrorism serves several important national security and foreign policy interests. First, allowing blocked assets to be attached to enforce a terrorism judgment compensates the victims of terrorism for their loss. Second, such enforcement measures hold state sponsors of terrorism accountable for their complicity in acts of terrorism. Third, requiring state sponsors of terrorism to compensate the victims of terrorism for their loss may deter them from supporting terrorist activities in the future. Finally, attaching blocked assets to satisfy a terrorism judgment provides an important incentive for private plaintiffs to bring similar claims against state sponsors of terrorism in the future. If such assets are placed beyond the reach of victims of terrorism because they are blocked under the **IEEPA**, this would discourage victims of international terrorism from bringing such tort claims against state sponsors of terrorism.

82. Section *8772* strengthens the United States economic sanctions regime against Iran. The statute modifies and supplements **§ 201** of the **TRIA**, by clarifying Congress's intent that the blocked assets "of" a terrorist party are not limited to assets owned by that terrorist party, but include blocked assets in which a terrorist party holds a beneficial interest. Moreover, **§ 8772** makes the **TRIA** coextensive with Executive *Order 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012)*, which authorizes blocking the assets of the Government of Iran, including the Central Bank of Iran. Specifically, *§ 8772* provides that $1.75 billion of blocked assets in which the Government of Iran has a beneficial interest shall be subject to attachment to satisfy terrorism judgments

1   against Iran that have been consolidated into a single case if a court deter-mines two

2   preconditions are met.

3

4       **Congress Has Plenary Power to Regulate Foreign Commerce,**

5       **Including the Disposition of Blocked Assets in Which Iran**

6       **Has a Beneficial Interest**

7

8       83. Article **I** of the **Constitution** gives Congress the exclusive and plenary authority "[t]o

9   regulate commerce with foreign nations[.]" **U.S. Const. art. I, § 8, cl. 3**. The authority to

10  regulate foreign commerce extends to foreign assets used in international commerce. See,

11  **Orvis v. Brownell**, 345 U.S. 183, 188 (1953); **Propper v. Clark,** 337 U.S. 472, 482-86 (1949).

    It includes the power to block and dispose of the assets of foreign nations that are held in a

12  United States bank account. Congress shares its authority over interstate commerce with the

13  states, but the power of Congress over foreign commerce is "exclusive and absolute." See,

14  **Buttfield v. Stranahan**, 192 U.S. 470, 492-93 (1904). As such, Congress has even greater

15  authority when it comes to regulating commerce with foreign nations. See, **Bd. of Trustees of**

16  **Univ. of Ill. v. United States**, 289 U.S. 48, 60 (1933). The primary purposes of the foreign

17  commerce clause are protection of national security and ensuring uniformity in foreign policy.
    Id.

18

19      84. From a regulatory standpoint, this distinction makes foreign commerce, and by

20  extension, foreign assets, different in kind from domestic commerce. Pursuant to this exclusive

21  and plenary power, Congress created a comprehensive scheme of regulations governing

22  commercial transactions with the Islamic Republic of Iran. As part of that comprehensive

23  regulatory scheme, **§ 8772** is a proper exercise of the power of Congress to regulate commerce

    with foreign nations. **22 U.S.C. § 8772**.

24

25

26

27

28

- 24 -

## Pursuant to Its Authority to Regulate Foreign Commerce,
## Congress May Block Foreign Assets

85. In 1977, Congress enacted the **IEEPA**, Pub. L. No. 95-223, 91 Stat. 1626 (1977) **(codified at 50 U.S.C. §§ 1701 et seq.)**, which delegates to the Executive sweeping authority to impose economic sanctions and block foreign assets in times of declared national emergencies. The **IEEPA** essentially amended the **Trading with the Enemy Act of 1917** (**TWEA**), *50 U.S.C. app. §§ 1-44*, leaving the **TWEA** intact for times of war. Under the **IEEPA**, Congress delegated extensive authority to the President to impose economic sanctions against foreign nations as well as their nationals, and to block their assets. Significantly, the President can prohibit United States banks from engaging in any transactions involving funds in which a foreign country or national thereof has any interest and order that such funds be blocked. **50 U.S.C. § 1702(a)(1)(A)(i)**. The Office of Foreign Assets Control, the agency within the Department of Treasury responsible for administering economic sanctions programs under the **IEEPA**, defines "interest" broadly in its regulations and does not restrict blocking actions merely to property in which a foreign nation or national has an ownership interest. **31 C.F.R. § 544.305 (2015)**. Ultimately, Congress retains concurrent authority to block foreign assets and direct their disposition.

## The Political Branches Have Authority to Settle
## The Claims of United States Nationals Against Foreign States

86. Where a United States national has a claim against a foreign state, "it is not for the court, but for the government, to consider whether it be a case proper for compensation." **United States v. Schooner Peggy**, 5 U.S. (1 Cranch) 103, 109 (1801). This Court in **Dames & Moore v. Regan**, 453 U.S. 654, 674 (1981) examined the authority of the political branches to regulate the settlement of claims of United States nationals against the Government of Iran. In that case, **Dames & Moore** sued Iran and secured judgment by obtaining a prejudgment attachment of Iranian property blocked by an Executive Order issued in response to the 1979 Hostage Crisis in Tehran. **Id. at 663-64**. Subsequently, to secure the release of the

hostages, President Carter entered into an executive agreement under which the United States was obligated to "terminate legal proceedings in United States courts involving claims of United States nationals against Iran, to nullify all attachments and judgments obtained therein, and [refer all such terminated claims] to binding arbitration in an Iran-United States Tribunal." **Id. at 654**.

87. In Dames & Moore v. Regan, the Court addressed the power of the political branches to suspend thousands of claims pending in **Article III** courts, nullify the prejudgment attachments of American creditors, and order the transfer of blocked assets back to Iran. The Court held unanimously that the President could suspend those claims and, when acting pursuant to congressional acquiescence and the "sweeping and unqualified" authority under the **IEEPA**, was permitted to "override judicial remedies" and "otherwise permanently dispose of the assets." **Id. at 671**. Moreover, the Court held that the President's nullification of prejudgment attachments did not usurp the role of the judiciary, and therefore did not violate separation of powers. **Id. at 684**. Congressional acquiescence to the President's conduct was central to the Court's decision. **Id.at 668-70**.

88. Section *8772* is also the product of coordinated action by the Legislative and Executive Branches. While the Executive Order in **Dames & Moore** transferred and nullified prejudgment attachments on blocked assets in response to the Iranian Hostage Crisis, *§ 8772* made specific blocked assets available for attachment in satisfaction of judgments stemming from several terrorist attacks sponsored by Iran. In both instances, however, Congress and the President worked together to regulate Iranian assets pursuant to the **IEEPA** and control their disposition. Applying the reasoning of **Dames & Moore**, if Congress can grant authority to nullify interests of American creditors in blocked assets, it follows that Congress can also nullify the interests of a state sponsor of terrorism in blocked assets, and authorize courts to attach those blocked assets in satisfaction of out-standing terrorism judgments against Iran.

89. This conclusion is bolstered by the longstanding practice of Congress to settle the claims of United States nationals against foreign states by passing legislation. For example, in 2000, Congress passed legislation governing the payment of specified judgments against Iran and Cuba obtained by victims of state-sponsored terrorism. **Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), Pub. L. No. 106-386, § 2002, 114 Stat. 1464** (codified at **28 U.S.C. §§ 1606, 1610**). In the **VTVPA**, Congress directed the Department of

Treasury to use blocked assets of Iran and Cuba as well as proceeds from consular property rentals to pay the judgments of persons who:

> *as of July 20, 2000, held a final judgment for*
> *a claim or claims brought under [28 U.S.C.*
> *§ 1605(a)(7)] against Iran or Cuba, or * * **
> *filed suit under such section * * * on February*
> *17, 1999, December 13, 1999, January 28,*
> *2000, March 15, 2000, or July 27, 2000.*
> *28 U.S.C. § 1606(a)(2)(A)(i)-(ii).*

90. Like **§ 8772**, the **VTVPA** referred to specific judgments and lawsuits. While **§ 8772** does so by reference to the name of the case into which multiple judgments have been consolidated, the **VTVPA** did so by reference to judgments obtained by a certain date (the cut off was three months prior to the enactment, so at the time, it necessarily extended to only six judgments) and to five specific dates on which an additional five lawsuits had already been filed, but judgments had not yet been entered. The effect of both statutes is the same – they apply only to a limited number of pending cases expressly identified by Congress in the statute. The **VTVPA** applied to one case against Cuba and ten cases against Iran, while **§ 8772** applies to eighteen judgments against Iran. In re **Islamic Republic of Iran Terrorism Litigation, 659 F. Supp. 2d 31, 57 (D.D.C. 2009)**; see also **David M. Ackerman, Cong. Research Serv., Suits Against Terrorist States 10, 14-17 (2002)**. Similar to **§ 8772**, the **VTVPA** also specified how these judgments would be funded. The **VTVPA** required that to the extent any judgments against Iran were paid by the United States government from general treasury funds, the President would recover that amount from Iran "preceding the normalization of relations" and that "no funds shall be paid to Iran, or released to Iran, from property blocked under the **[IEEPA]** or from the Foreign Military Sales Fund, until such subrogated claims have been dealt with to the satisfaction of the United States." **28 U.S.C. § 1606(c)**.

## Section 8772 Is an Integral Component of Comprehensive Economic Sanctions Regime Against Iran Intended to Protect United States National Security, and Should Be Afforded Substantial Deference by the Judiciary

91. Iran is "the most active state sponsor of terrorism," and poses an extraordinary threat to United States national security. **U.S. Dep't of State, Country Reports on Terrorism 2014 284-85 (2015)**, available at *http://www.state.gov/documents/organization/239631. pdf*. Iran is responsible for financing, supervising, and supporting some of the deadliest terrorist attacks perpetrated against the United States. **Id**. Moreover, the U.S. Department of Defense estimates that Iran provides between $100-200 million per year in funding to Hezbollah. **U.S. Dep't of Def., Unclassified Annual Report on Military Power of Iran 8 (2010)**, available at *http://fas.org/man/eprint/dod_iran_2010. pdf*. To curtail Iran's terrorist activities and reduce its ability to develop nuclear WMDs, the political branches have devised a complex and comprehensive counter-terrorism and economic sanctions strategy against Iran.

92. In response to Iran's complicity in the Beirut terrorist bombings, in January 1984, the U.S. Department of State designated Iran a state sponsor of terrorism. *See **49 Fed. Reg. 2,836 (Jan. 23, 1984)*** as such, Iran was designated by the State Department a state sponsor of terrorism pursuant to **50 U.S.C. app. § 2405(j), 22 U.S.C. §§ 2371, 2780(d)**. Iran has maintained that infamous distinction for the last thirty years. *See* **Country Reports on Terrorism 2014**, *supra* at **8**. Further, after finding that Iran was "actively supporting terrorism as an instrument of state policy," President Reagan issued **Executive Order 12613**, which banned all imports of goods and services originating in Iran. **52 Fed. Reg. 41,490 (Oct. 28, 1987). In 1992**, Congress became involved in imposing economic sanctions against Iran by enacting the **Iran-Iraq Arms Non-Proliferation Act of 1992, Pub. L. No. 102-484, 106 Stat. 2571** (codified at **50 U.S.C. § 1701** *note*), which significantly tightened restrictions on United States exports to Iran.

93. **Limitations**. —An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section **1605(a)(7)** (before the date of the enactment of this section) or section **589 of the Foreign Operations, Export**

- 28 -

**Financing, and Related Programs Appropriations Act, 1997** (as contained in section **101(c) of division A of Public Law 104–208**) not later than the latter of—

(1) 10 years after April 24, 1996; or

(2) 10 years after the date on which the cause of action arose.

(c)Private Right of Action. —A foreign state that is or was a state sponsor of terrorism as described in subsection **(a)(2)(A)(i)**, and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph **(1), (2), or (3),**

for personal injury or death caused by acts described in subsection **(a)(1)** of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.

94. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

95. (d)Additional Damages. —After an action has been brought under subsection **(c)**, actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection **(c)** is based.

(e) Special Masters. —

(1) In general. —

The courts of the United States may appoint special masters to hear damage claims brought under this section.

(2) Transfer of funds. —

The Attorney General shall transfer, from funds available for the program under section **1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c)**, to the Administrator of the United States district court in which any case is pending which has been brought or maintained under

this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

(f)Appeal. —

In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section **1292(b)** of this title.

(g) Property Disposition. —

(1) In general. —In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is—

(A) subject to attachment in aid of execution, or execution, under section **1610**;

(B) located within that judicial district; and

(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

(2) Notice. —

A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

(3) Enforceability. —

Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

(h)Definitions. —For purposes of this section—

(1) the term "aircraft sabotage" has the meaning given that term in *Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation*;

(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

(3) the term "material support or resources" has the meaning given that term in section **2339A** of title **18**;

(4) the term "armed forces" has the meaning given that term in **§101** of title **10**;

(5) the term "national of the United States" has the meaning given that term in **§101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))**;

(6) the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of **section 6(j)** of the **Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), [1] section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780)**, or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

(7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section **3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)**.

*(Added Pub. L. 110–181, div. A, title X, § 1083(a)(1), Jan. 28, 2008, 122 Stat. 338.)*

96. Courts have repeatedly found Iran liable for terrorist acts committed by Hizbollah. *See. e.g.,* **Stethem v. Islamic Republic of Iran**, 201 F. Supp.2d 78 (D.D.C. 2002); also see, **Wagner v. Islamic Republic of Iran**, **172 F. Supp.2d 128 (D.D.C. 2001)**; **Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000)**; **Cicippio v. Islamic Republic of Iran**, 18 **F. Supp.2d 62 (D.D.C. 1998)**.

97. Foreign states are immune from suit in the United States courts unless one of the exceptions to the **FSIA, 28 U.S.C. § 1601-1611** applies. The so-called "***Flatow Amendment***" to the FSIA in 1996 authorized suits against foreign states that sponsor terrorism for:

*"personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7)*

98. Ms. Cattaui's murder qualifies as an extrajudicial killing and this Court may entertain this claim under the FSIA if: (1) Iran has been designated a state sponsor of terrorism at either the time the incident occurred or as a result of the terrorist act in question; and (2) either Josephine Cattaui or plaintiffs were United States citizens at the time of the incident. Both of these requirements are satisfied in this case.

99. An extrajudicial killing is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples." **28 U.S.C. § 1605(e)(1)** (adopting the meaning

given that term in **§3 of the Torture Victim Protection Act of 1991**). Cattaui's murder falls within the definition of an extrajudicial killing as it is clear that Cattaui's murder was deliberate and premeditated and there is no evidence that it was sanctioned by any sort of judicial tribunal.

100. This case has faced numerous challenges, setbacks and interferences by other actors and outside influences including groups in Iran and Argentina with political interest who have hampered both law enforcement and family investigation. In addition, the investigation in the attack is still an ongoing open case, as recently as recently as July 18, 2017 the U.S. State Department urged the Argentinian government to do more and stated Iranian linked perpetrators must still be brought to justice.

101. It is therefore the hope and prayers of this Honorable Court to grant this motion for a hearing where it might in fact allow Petitioners the opportunity to seek and obtain more information and details. Petitioners have attempted in 2016 to contact the Argentinian authorities including the current senior government investigator to ask for a status of the investigation, and requesting a meeting to even share some of the information that Ms. Cattaui's family was able to obtain through their own investigators, but as of the submission of this petition, there has been no reply from the Argentinian government or its representatives.

102. The Sassoon and Cattaui family had retained the services of retired U.S., Israeli, and British law enforcement and intelligence investigators to assist in investigating the case on their own. The family is now finally in possession of irrefutable evidence beyond reasonable doubt, including physical evidence, testimonies as well as official records linking Hezbollah, the Iranian government and the defendants identified in this petition to the attacks on the AMIA building on July 18, 1994. Plaintiffs petition this Honorable court to allow them the opportunity to make these records a matter of public record by allowing a jury trial or evidentiary hearing.

103. This petition is not about monetary compensation, for to Petitioners Ms. Cattaui is irreplaceable. No amount of money will bring her back, and make up for the times she and her son missed on and the opportunities she missed on to meet her only grandson. This petition is about justice and hopefully give or cause to give the authorities in Argentina to do what is right and reinstate the red notice with Interpol and bring the perpetrators to justice.

104. Petitioners would have much preferred for the guilty party to be brought to justice and face a trial, and its conclusion be appropriately and procedurally convicted and sentenced according to law. However, both the Plaintiffs and the victims' survivors in Argentina were

denied that opportunity, and despite all the media attention and continuous good will and support of the U.S. government including its federal law enforcement and intelligence agencies, Plaintiffs are nowhere closer to have closure on this nightmare.

105. Filing this petition in open court within the 10-year term under law was impractical as the current evidence that exist today did not exist during that time. The evidence obtained and secured by Plaintiffs were only secured and confirmed recently.

106. Therefore, Plaintiffs pray that this Honorable Court will grand special dispensation and grant permission to proceed under the circumstances and treat this petition as timely filed.

107. This case goes beyond the AMIA attacks, as new developments and evidence have come to light, it is critical to elucidate the inherent clear and present danger posed by Defendants to the Western Hemisphere, the entire international community and the United States in particular.  Iran is investing in strengthening the political and economic relations with several countries in Latin America. It is also actively engaged in religious proselytizing, particularly aimed for the poorest sectors of the Latin American society. Converts to Islam eventually undergo religious and political training, including in Iran, to prepare these new adherents to become instruments and agents of the Iranian regime.

108. According to the GATESTONE Institute (International Policy Council), which conducts national and international conferences, briefings and events for its members and others, with world leaders, journalists and experts -- analyzing, strategizing, and keeping them informed on current issues, and where possible recommending solutions: *"Mohsen Rabbani, an Iranian mullah and a former cultural attaché in Argentina, is a leading figure in spreading Islam in Latin America, particularly in Brazil."*

109. Rabbani, who is presently the director of Oriental Thought Cultural Institute in the Iranian city of Qom, continues, unabated, to proselytize in Latin America. According to Brazilian sources, he has traveled several times to Brazil under a false identity in order to recruit new converts to Islam. According to Argentine prosecutor, Alberto Nisman, ***"Rabbani is a serious security threat, including in Brazil. In Argentina, he spread his vision of radical, extremist, and violent Islam, which resulted in dozens of casualties during the Buenos Aires terrorist attacks. Now, based in Iran, he continues to play a significant role in the spread of extremism in Latin America."***

- 33 -

110. The activity Rabbani is developing in Belo Jardim, in the Brazilian state of Pernambuco, where local police have found evidence that the recruitment of Brazilians, and subsequent traveling to Iran, involves more than spiritual enlightenment through religion, is particularly alarming. Along with the recruits in Belo Jardim, youth from Argentina, Chile, Colombia, Costa Rica, and Mexico are also traveling to Iran.

111. The Brazilian Federal Police has information that Rabbani, in one of his latest visits to Brazil, used methods that could cause a "diplomatic crisis." Rabbani embarked a plane in Tehran bound for Caracas, Venezuela. From there, he entered Brazil illegally. Operated by Iran's state airline. The Venezuelan government hid the passenger lists from Interpol on that flight. Rabbani's movements were being monitored, the idea being to detain him in Brazil. Notified, the Federal Police set up an operation, but the order to execute the operation took longer than anticipated, due to complicated discussion about the political implications. Once again, Rabbani managed to escape. In the 675 pages complied by the Argentinean Investigation Unit of the Office of the Attorney General on the AMIA terrorist attack, it is reported that one of the ways used by Rabbani to secure an individual's loyalty is to send them to Iran so as to deepen their knowledge of Islam.

112. One of Rabbani's favorite disciples in Latin America is Sheik Karim Abdul Paz, an Argentinian convert to Shiite Islam, who formerly went by the name, Santiago Paz Bullrich. He used to be the imam of the Iranian-run al-Tahuid Mosque in Buenos Aires. Now he is imam of the Islamic Cultural Center in Santiago de Chile. He studied in Qom, and became a leading figure of Shiite Islam in Latin America. He doesn't hide his sympathies for Middle Eastern terrorist groups and maintains that the Shiite group, Hezbollah, is not a terrorist movement, but a "fundamental part of the heroic worldwide resistance against the U.S. and Israel's terrorist imperialism". This, apparently, is what Rabbani is teaching to Latin American converts during his spiritual courses in Iran.

113. Rabbani is a serious security threat, including in Brazil. In Argentina, he spread his vision of radical, extremist, and violent Islam, which resulted in dozens of casualties during the Buenos Aires terrorist attacks. Now, based in Iran, he continues to play a significant role in the spread of extremism in Latin America. This man poses a clear threat to the United States and our national security, given his attempts to recruit loyalists at our southern border

could potentially have far greater ramifications including potential infiltration and crossings by jihadists.

114. The enticement of Brazilians for courses abroad has been monitored for four years by the Federal Police and the ABIN, the government's secret service. It is Rabbani himself, with help from people he trusts, who chooses those who will travel. Between 2007 and 2011, three groups of Brazilians have visited Iran and more groups have been recruited since. There are plenty of reasons for such surveillance. The course has a strong religious content. But that is not what is of concern. Students from one of Rabbani's groups have confided Plaintiff's investigators that, during these travels, they have visited the premises of the radical Lebanese group Hezbollah. Other reports, say that Rabbani's courses are some sort of an entryway for terrorism. According to these documents, the classes include radical preaching and training in military camps.

115. The city of Belo Jardim, a Brazilian municipality in the state of Pernambuco, is the most active center for the recruitment of extremists. Of the eight selected Brazilians for the first class taken to Iran in late 2007, four were from Belo Jardim. A brother of Mohsen Rabbani, who lived in Curitiba, personally took care of recruitment. Pernambuco, a city of 58,000 inhabitants deserves constant attention from the Federal Police and ABIN. Among the Brazilians lured are: a taxi motorcyclist, a schoolteacher, an official of the Banco do Brasil, and an English teacher — all from humble backgrounds. The motorcyclist, Erlan Batista Machado, had never been on a plane until he flew to Sao Paulo, and from there to Iran, where he studied at the invitation of Rabbani. In Iran, he gained a new name: Sayd. Approached by Plaintiffs' investigators through the Brazilian weekly magazine *Veja*, Erlan said he accepted the invitation because he wanted to know more about Islam, but would not elaborate more about the curriculum or confirm whom he met with or what type of training if any he may have received while in Iran.

116. Messages exchanged between the students and Rabbani, and intercepted by Brazilian police, reveal that the goal of recruiting Brazilians and traveling to Iran involves more than spiritual enlightenment through religion. The messages contained evidence that the group and its leaders in Iran have something to hide. The report also had access to e-mails exchanged by Joao Adriano (Abu Husayn) and Rodrigo Jalloul, a Sao Paulo resident who went to Iran for almost four years and remained there. Today, according to the investigation, he is the right arm of Rabbani for matters that relate to clandestine activities in Brazil. In a message dated April 5,

2010, Joao warned Adriano Jalloul, who planned to come to Brazil for a visit, of the existence of investigations into the group: "*The Federal Police got involved in an investigation into Hezbollah money laundering. We can talk more about this some time, but I believe that, as of today, we have been monitored for more than one (sic). If you come, do it in a secretive manner, at the last minute, and only let us know when you are in the region.*"

## **Punitive Damages**

117. The conduct of Defendants described above is outrageous. Defendants' conduct demonstrates a reckless disregard for human life and a conscious disregard for public safety. The acts and omissions described above were willful and performed with actual or implied malice. Punitive and exemplary damages are therefore appropriate and should be imposed in this instance.

## V. PRAYER FOR RELIEF

Plaintiffs David Edouard Sassoon, the Sassoon family and the Cattaui family as executrix of the estate of Josephine Celine Esther Moise Cattaui, seeks compensatory damages for his wrongful death. As the Court has herein found, Ms. Cattaui was a distinguished expert in intelligence analysis, linguistics, and Middle Eastern studies, and presumably, had she not been murdered, would have continued with her professional and academic career at a salary commensurate with her stature. Ms. Cattaui had every intention to pursue a PhD in Middle Eastern Studies and Linguistics at either Harvard or Columbia Universities in the calendar year 1996 as she had begun making plans and had telephoned each university and requested applications and course studies requirement. Indeed, her services were highly valued, as evidenced by the generous salary she was paid, and numerous fringe benefits she received at MZM Inc. Josephine Cattaui's estate is entitled to recoup the economic loss caused by her wrongful and untimely death.

WHEREFORE, Plaintiffs also seek monetary damages for loss of consortium and solatium, or the loss of Josephine Cattaui's society and companionship, and the mental anguish occasioned by the circumstances and prematurity of her death. In computing awards for loss of consortium and solatium, the Court appropriately shall consider the following factors:

(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e. closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death. *See* **United States v. Stethem**, 201 F. Supp.2d 78, 90 (D.D.C. 2002).

118. Josephine Cattaui's death was unforeseen, sudden, violent, egregiously malicious, and took place at the AMIA building, a place of communal gathering, education, fellowship, and spiritual fulfillment. A place that was associated with peace, harmony and tranquility not only for the Jewish community in Argentina, but also for non-Jews as well as Jews from around the world as the Jewish community in Argentina represented the largest Jewish community of any country in Latin America, and is considered one of the oldest. Petitioners, also pray this Honorable Court will grant the following:

1. Compensatory damages to be paid by all Defendants, according to proof at trial, considering that Ms. Cattaui's salary at the time of her death was $92,450.00 per annum including medical coverage and health benefits, a pension plan as well as stock options and a 401K that she had through her employment;

2. Punitive damages in the amount of $1.5 billion, all of which Plaintiffs will donate as following: 20% to survivors and families of the victims of the AMIA attack on July 18, 1994; 10% to the Aleph Institute in Florida, 20% for the construction of 3 memorials for victims of terrorism in the U.S., Argentina, and Israel, the construction of a hospital in Israel in Ms. Cattaui's name, the construction of a schools in the U.S. and Israel in Ms. Cattaui's name, 20% divided between Ahavas Chaim Yeshiva, Yeshivat Har Etzion, Yeshivat Ha'golan, Yeshiva Kyriat Malachi, Or LeIsrael, and Midreshet Rajel Latino, 5% to Wounded Warrior Project in the U.S., 5% to Marine Corps Heritage Foundation, 5% for the  Benji Hillman Foundation, 5% for the Lone Soldier Center in Israel, 5% for the AMIA in Argentina and 5% for the construction of a Jewish School in Buenos Aires for the Jewish community.

3. Costs and attorneys' fees of this lawsuit, with interest;

4. Any other relief as the court deems appropriate.

119. Plaintiffs also request the following injunctive relief:

1. Impose travel restrictions on defendants and direct the U.S. government to impose equal travel restrictions on Defendants' relatives, family members, and associates.

2. Should the Islamic Republic of Iran agree to the extradition of the conspirators and coconspirators to the jurisdiction of Argentinian courts or since it is now revealed that among those dead was a U.S. citizen, to the jurisdiction of this court or any other federal court within the United States, to answer for their crimes the Plaintiffs are willing to forego any financial compensations or awards for damages.

3. The surrender and extradition of the conspirators and coconspirators must be accompanied by a formal public apology by the government of the Islamic Republic of Iran to the victims' families in Argentina and the family of Ms. Josephine Cattaui including immediate cessation of any material as well as financial support to Hezbollah, Islamic Jihad and HAMAS and declaration by Iran to cease and desist from sponsoring and supporting (overtly and or covertly) any forms of terrorism including political violence and interference in other nations' internal affairs. Support is herein defined as financial, political, logistical, training, intelligence, and or sanctuary to terrorists and operatives of terror groups.

4. The government of Iran must also declare that it has ceased any hostile intentions including insurgency, terrorism, acts of violence, and acts of war against the State of Israel, its citizens, military forces, diplomatic missions and any interests of Israel within Israel and/or abroad. This immediate cessation of violence, and acts of terrorism includes any such acts against the Jewish communities outside of Israel anywhere and wherever they may live, work and or travel to on vacation.

120. Should the government of Iran agree to implement these terms outlined herein by making a public declaration including publicly directing both Hezbollah and HAMAS to cease and desist from any forms of violence and terrorism against the State of Israel and the global Jewish community, in addition to committing to solving whatever conflict or political disagreements through proper legal, political and diplomatic channels. This must also include Iran's public commitment to peace and diplomatic talks to at least reduce the political, military and diplomatic tension within the Middle East, Plaintiffs will be willing to forego any monetary compensation due to them under the laws outlined in this Complaint.

121. Plaintiffs, are hereby asserting that neither have a law degree, nor did they have any formal or informal legal training. It is therefore that Plaintiffs are requesting from this Honorable Court to exercise reasonable discretion and leeway in adjudicating over this Complaint and excuse any misquotation of the law or legal procedural error that may have occurred within this Complaint before the Court. If possible, Plaintiffs request in the name of equitable justice, that should there be any procedural, legal, and or any other forms of errors in this Complaint including but not limited the appearance of poorly presented or lack of prima facie, for this Honorable Court to allow Plaintiffs sufficient opportunity to correct said errors after it is pointed out by the Court.

Dated: August 15, 2017                    One Behalf of the Sassoon and Cattaui Families


*David Sassoon*                           ,
David Edouard Sassoon
For Plaintiffs
Mr. DAVID EDOUARD SASSOON,
The Estate of JOSEPHINE CELINE ESTHER
MOISE CATTAUI, And THE CATTAUI FAMILY

## CERTIFICATE OF DELIVERY

Plaintiffs hereby confirm and declare that a copy of the accompanying Complaint has been mailed using the U.S. Postal Service and or other modes of delivery using a certified and bonded parcel service. The accompanying Complaint was delivered to Defendants' known legal, diplomatic representatives and or agents in the United States pursuant to Rule 5(c), Rule 26(a)(1) or (2), and Rule 25 of the Federal Rules of Appellate Procedure.

Complaint Delivered to:

Permanent Mission of the Islamic Republic of Iran
H.E. Mr. Gholamali Khoshroo Ambassador and Permanent
Representative of the Islamic Republic of Iran to the United Nations
622 THIRD AVENUE, 34TH FLOOR
NEW YORK N.Y. 10017;

And

The Embassy of Lebanon
Chargé d'Affaires a.i
**Ms. Carla Jazzar**
2560 28th Street Northwest
Washington, DC 20008

Caused to deliver on this 16th day of August 2017

_David Sassoon_
David Edouard Sassoon



013

TYVEK® IS RECYCLABLE.
HDPE    ©2003. DUPONT™ AND TYVEK® ARE TRADEMARKS OF DUPONT.

**PRESS FIRMLY TO SEAL**

# PRIORITY
★ MAIL ★

UNITED S
POSTAL S
VISIT US AT U
ORDER FREE SUPPI



B/C
8/16/17

FROM:

Sassoon
345 sw Coconut Key Way
Port Saint Lucie FL
34986

TO:
Alto Lee Adams Sr
Us Courthouse
Us clerk office
101South Us HWY 1 FL Suite
2008 Ft Pierce FL 34950



FOR DOMESTIC AND INTERNATIONAL USE

Label 228, March 2016

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PRIORITY MAIL ®1-Day

Expected Delivery Day: 08/16/2017    C007

USPS TRACKING NUMBER

9505 5139 5522 7227 1528 27

1131060274-13



UNITED STATES
POSTAL SERVICE®